# In the United States District Court
# for the Southern District of Georgia
# Waycross Division

| | | |
|---|---|---|
| WILLIAM R. HALL, | * | |
| | * | |
| Plaintiff, | * | |
| | * | |
| vs. | * | |
| | * | CV 514-45 |
| WESLEY GREEN; JAMES MURRAY; | * | |
| CHRIS CARTER; ONE UNKNOWN | * | |
| OFFICER; and CITY OF FOLKSTON, | * | |
| GEORGIA, | * | |
| | * | |
| Defendants. | * | |

## ORDER

Presently before the Court are Defendants' Motion to Dismiss Plaintiff's Complaint (Dkt. No. 8) and Motion to Dismiss Plaintiff's Amended Complaint (Dkt. No. 15).[1] Upon due consideration, Defendants' Motion to Dismiss is **GRANTED**.

## I.  FACTS[2]

On May 22, 2013, in the middle of the afternoon, Plaintiff William R. Hall was sitting on his couch and had just started watching the movie "O Brother, Where Art Thou?". Dkt. No. 1, ¶¶ 5-7. Approximately ten minutes into the movie, Defendant

---

[1] The Amended Complaint supersedes the initial Complaint and becomes the operative pleading in the case. <u>Lowery v. Ala. Power Co.</u>, 483 F.3d 1184, 1219 (11th Cir. 2007).

[2] The Court accepts Plaintiff's allegations as true for the purpose of deciding these motions.

AO 72A
(Rev. 8/82)

Officer James Murray entered Plaintiff's yard and approached an open window of Plaintiff's house. Defendant Murray asked if he could speak with Plaintiff. Id. According to the body of Plaintiff's Complaint, Defendant Murray "had no articulable suspicion that Plaintiff had committed any crime when he first approached Plaintiff and spoke to him through the window." Dkt. No. 12, ¶ 49. Plaintiff asked if Defendant Murray had a warrant, to which Defendant Murray responded, "No." Plaintiff said, "[G]et the f--- out of my yard", before slamming the window and closing the curtains. Dkt. No. 1, ¶ 7. A few minutes later, someone called Plaintiff on the phone and told him the police were surrounding his home. Plaintiff continued to watch the movie, and throughout the rest of it, the police banged on the windows to Plaintiff's house and yelled things like, "Come out. We just want to talk." Plaintiff did not respond to the officers and continued to watch his movie. Id. at ¶¶ 10-13.

Plaintiff recognized three of the officers by sight and voice: Defendant Chief of Police Wesley Green, Defendant Chris Carter, and Defendant Murray. There was another officer present who Plaintiff did not recognize. Id. at ¶ 12. Plaintiff alleges that he heard Defendant Murray's voice repeatedly during the course of the movie and believes that Defendant Murray never

left his home to obtain the warrants at issue in this suit.  Id.
at ¶ 14.

After the movie ended, the police started kicking in
Plaintiff's back door, which according to Plaintiff, "took them
a while[.]"  Id. at ¶ 15.  Because of a previous experience
where Plaintiff alleges he was beaten by sheriffs for not
allowing them into his home, Plaintiff was frightened for his
safety and hid in a closet.  Id. at ¶ 16.  After the door was
knocked down, Defendants entered Plaintiff's home, searched it,
and found Plaintiff in the closet wearing "nothing but his
underwear[.]"  Defendants arrested Plaintiff for obstruction and
walked him outside without allowing him to get dressed.
Plaintiff was humiliated and embarrassed.  Id. at ¶¶ 17-18.

Plaintiff was never shown an arrest warrant by the police.
Plaintiff was in jail for several hours before making bail.
When Plaintiff returned home, he found the search warrant
"laying on the back of his couch."  He subsequently obtained a
copy of the arrest warrant from the Charlton County courthouse.
Plaintiff asserts that the search warrant is facially invalid.
The State Court solicitor dismissed the prosecution of Plaintiff
for the obstruction charge.  Id. at ¶¶ 19-23, 26.

Plaintiff alleges that Defendants Green, Carter, and the
unknown officer conspired with Defendant Murray to violate
Plaintiff's constitutional rights and participated in the scheme

to do so.  Id. at ¶ 27.  He further maintains that the Defendant
Officers intended to deprive him of his Fourth and First
Amendment rights "in retaliation for his challenge to Officer
Murray's authority and for his protected speech when he told
Officer Murray to get the F--- out of his yard."  Dkt. No. 12, ¶
45.  Plaintiff states that the Defendant Officers intended to
demonstrate that they had more power than Plaintiff and that
Plaintiff "had no right to challenge them or tell them what to
do."  Id.  In support of these contentions, Plaintiff pointed to
the Defendant Officers' actions in securing his home to prevent
potential flight while a warrant was obtained, continually
pounding on the windows and insisting that Plaintiff come out
and talk, seeking and executing the warrants, and bringing
Plaintiff into the public view in his underwear without allowing
him to get dressed.  Id.

Plaintiff maintains that Defendant City of Folkston ("the
City") failed to train its police officers adequately.
Plaintiff further asserts that Defendant Green is the final
policymaker and decision maker for the City of Folkston Police
Department.  Dkt. No. 1, ¶¶ 28-29.

Plaintiff sued Defendants under 42 U.S.C. § 1983, for
violating his Fourth and First Amendment rights.  Plaintiff also
brought state law claims for trespass and invasion of privacy.
Additionally, he seeks punitive damages and attorneys' fees.

AO 72A
(Rev. 8/82)

Plaintiff notes that he paid $1,950.00 to repair his back door and $120.00 to a bondsman to get out of jail. Id. at ¶¶ 24-25.

Attached to Plaintiff's Complaint is a copy of Defendant Murray's police report along with the relevant search and arrest warrants. Dkt. No. 1, pp. 8-16. Regarding the police report, Plaintiff stated, "Officer Murray's version of this event is set forth in his report, which is attached as Exhibit A and incorporated herein by reference." Dkt. No. 1, ¶ 9. As for the warrants, Plaintiff expresses a belief that Defendant Murray never left Plaintiff's house to obtain them. Nonetheless, Plaintiff attached the warrants as Exhibits B and C to his Complaint and incorporated them by reference. Id. at ¶¶ 21-22.

The police report lists two Incident Types and Arrest Charges: "obstructing/hindering law enforcement officer (MISD.)", which was associated with "Code 16-10-24(a)", and "criminal trespass warning", which had no Code number associated with it. Dkt. No. 1, pp. 8-11. The incident date was shown as May 22, 2013, and the time was listed as approximately 3:45 PM for both the incident and report. Id. On the Arrest & Booking Report, the arrest date and time was May 22, 2013 at 6:40 PM, and the release date and time was shown as May 24, 2013 at 8:09 PM. Dkt. No. 1, p. 11.

The "Supplemental Report" section of the police report describes the incidents in detail, from Defendant Murray's

perspective. Defendant Murray wrote that he received a call "in reference to a 10-37 person at the residence." A woman named Elaine Brown "advised [Defendant Murray] that William Hall was trying to come in her residence. She stated that he was on a red racing bicycle and lived across from [a particular store]." Dkt. No. 1, p. 12. Defendant Murray went to the residence described by Ms. Brown and "found [Plaintiff's] bicycle tracks going into the residence." Defendant Murray found that the front door was "locked and dead bolted." Then, he tried speaking with Plaintiff through the window. Defendant Murray describes that he "gave the lawful command to come to the front door", and Plaintiff refused. After ten minutes of trying to get Plaintiff to exit, Defendant Murray "went to the magistrate court and secured an arrest warrant for obstruction and also a search warrant to retrieve Mr. Hall from the residence." Id.

Defendant Murray described entering the house, arresting Plaintiff, and transporting him to the Sheriff's Office. Defendant Murray wrote that, while interviewing Plaintiff, he asked why Plaintiff did not just come out and talk, and Plaintiff said that he did not come out because he thought he was going to jail. Defendant Murray explained that he went to Plaintiff's home to serve a criminal trespass warning. Plaintiff asked if he would have gone to jail, and Defendant Murray responded that Plaintiff would not have gone to jail if

he had come out as requested. Then, Defendant Murray served

Plaintiff with the warrant for obstruction. Dkt. No. 1, p. 12.

Both warrants were issued by the Magistrate Court of

Charlton County. The arrest warrant affidavit read:

> Personally came James Murray, FPD, who on oath says
> that, to the best of his knowledge and belief, WILLIAM
> ROBERT HALL did . . . commit the offense of, TO-WIT:
> OCGA 16-10-24 OBSTRUCTION/HINDERING LAW ENFORCEMENT
> OFFICER, Misdemeanor in said County, between the hours
> of [cut off] and 7:00 PM, on [May 22, 2013]. . . Said
> offense being described as: OCGA 16-10-24
> Obstruction/hindering law enforcement officer,
> Misdemeanor, for that the said William Robert Hall did
> willfully and knowingly obstruct a law enforcement
> officer in the lawful discharge of his official
> duties; to-wit: disobeyed a lawful command given by
> Law Enforcement Officer James Murray and this deponent
> makes this affidavit that a warrant may be issued for
> his arrest.

Dkt. No. 1, p. 13. The warrant was signed by James Murray, as

affiant, and Magistrate Judge C. McMillan. The search warrant

affidavit, also made by Defendant Murray, described the location

and physical appearance of Plaintiff's house and stated "there

is now being concealed certain property, namely William Hall;

[various descriptors of Plaintiff] which are person [sic]

committed the crime of OCGA 16-10-24 obstruction of law

enforcement officer." The warrant was signed by Judge McMillian

at 6:18 PM on May 22, 2013. Dkt. No. 1, p. 15.

Defendants contend that because Plaintiff attached the

police reports to his Complaint, their contents should be

considered by the Court in reviewing the motions to dismiss.

AO 72A
(Rev. 8/82)

Plaintiff argues that he attached these documents as a shortcut to show what Defendant Murray wrote, but he does not allege the truthfulness of Defendant Murray's statements. Plaintiff maintains that Defendant Murray's statements are not Plaintiff's own allegations and should not be considered by the Court at this stage in the proceedings. However, in his briefing, Plaintiff attempted to address the statements in the police report as though they were allegations in his Complaint. See Dkt. No. 13, p. 7.

When exhibits contradict general and conclusory allegations in a pleading, the exhibits govern. Griffin Indus., Inc. v. Irvin, 496 F.3d 1189, 1205-06 (11th Cir. 2007) (citing Assoc. Builders, Inc. v. Ala. Power Co., 505 F.2d 97, 100 (5th Cir. 1974) ("Conclusory allegations and unwarranted deductions of fact are not admitted as true, especially when such conclusions are contradicted by facts disclosed by a document appended to the complaint. If the appended document, to be treated as part of the complaint for all purposes under Rule 10(c), Fed. R. Civ. P., reveals facts which foreclose recovery as a matter of law, dismissal is appropriate.")). Plaintiff's statement that Defendant Murray "had no articulable suspicion that Plaintiff had committed any crime when he first approached Plaintiff and spoke to him through the window" is conclusory and contradicts the specific facts set forth in the report Plaintiff elected to

AO 72A
(Rev. 8/82)

attach to his Complaint, which states that Defendant Murray went to Plaintiff's house pursuant to a citizen's complaint that Plaintiff had tried to enter the citizen's residence. Plaintiff has not offered any contradictory or alternative factual scenario for how or why the Defendant Officers came to be at his house on the day in question. The Court is simply not free to ignore the undisputed report, which states that Ms. Brown called the police and reported that Plaintiff tried to enter her home before the police visited Plaintiff on May 22, 2013.

## II.  LEGAL STANDARD

When ruling on a motion to dismiss brought pursuant to Rule 12(b)(6), a district court must accept as true the facts as set forth in the complaint and draw all reasonable inferences in the plaintiff's favor. Randall v. Scott, 610 F.3d 701, 705 (11th Cir. 2010). Although a complaint need not contain detailed factual allegations, it must contain sufficient factual material "to raise a right to relief above the speculative level." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007). At a minimum, a complaint should "contain either direct or inferential allegations respecting all the material elements necessary to sustain a recovery under some viable legal theory." Fin. Sec. Assurance, Inc. v. Stephens, Inc., 500 F.3d 1276, 1282-83 (11th Cir. 2007) (per curiam) (quoting Roe v. Aware Woman Ctr. for Choice, Inc., 253 F.3d 678, 683 (11th Cir. 2001)).

# III. ANALYSIS

## a. Qualified Immunity

The Defendant Officers assert the defense of qualified immunity. "The doctrine of qualified immunity protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" Pearson v. Callahan, 555 U.S. 223, 231 (2009) (quoting Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982)). Qualified immunity affords protection to a government official sued in his individual capacity "unless the law preexisting the defendant official's supposedly wrongful act was already established to such a high degree that every objectively reasonable official standing in the defendant's place would be on notice that what the defendant official was doing would be clearly unlawful given the circumstances." Terrell v. Smith, 668 F.3d 1244, 1250 (11th Cir. 2012) (quoting Pace v. Capobianco, 283 F.3d 1275, 1282 (11th Cir. 2002)).

First, the government official seeking the protection of qualified immunity must prove that he was acting within the scope of his discretionary authority when the alleged wrongful conduct took place. Terrell, 668 F.3d at 1250. Once that is shown, the burden shifts to the plaintiff to show that qualified immunity does not apply. Id. To do this, the plaintiff must

AO 72A
(Rev. 8/82)

show that (1) "the facts [plaintiff] has shown make out a violation of a constitutional right" and (2) "the right at issue was clearly established at the time of the defendant's alleged misconduct." Gilmore v. Hodges, 738 F.3d 266, 272 (11th Cir. 2013) (citing Pearson, 555 U.S. at 232). A court may decide, in its discretion, which of the two prongs to analyze first. Id. at 272-73.

The parties dispute whether or not the Defendant Officers were acting within the scope of their discretionary authority when the alleged wrongful conduct took place.

An officer is acting in the scope of his discretionary authority if he was "(a) performing a legitimate job-related function (that is, pursuing a job-related goal), (b) through means that were within his power to utilize." Holloman ex rel. Holloman v. Harland, 370 F.3d 1252, 1265-66 (11th Cir. 2004) (citation omitted). The test requires analyzing the "general nature of the defendant's action, temporarily putting aside the fact that it may have been committed for an unconstitutional purpose, in an unconstitutional manner, to an unconstitutional extent, or under constitutionally inappropriate circumstances." Id. at 1266. For the first prong, "the defendant must have been performing a function that, *but for* the alleged constitutional infirmity, would have fallen with [sic] his legitimate job description." Id. For the second prong, the Court must

AO 72A
(Rev. 8/82)

determine whether the officer was "executing the job-related function—that is, pursuing his job-related goals—in an authorized manner." Id.

> Each government employee is given only a certain 'arsenal' of powers with which to accomplish her goals. For example, it is not within a teacher's official powers to sign her students up for the Army to promote patriotism or civic virtue, or to compel them to bring their property to school to redistribute their wealth to the poor so that they can have firsthand experience with altruism.

Id. at 1267. Qualified immunity will not protect one who pursues a job-related goal if the means used "fall outside the range of discretion that comes with an employee's job[.]" Id.

At bottom Plaintiff argues that it was not lawful for Defendant Murray to command Plaintiff to speak with him because there was no warrant or reasonable suspicion of criminal activity. According to Plaintiff, Defendant Murray's command was unlawful because Plaintiff was within his rights to refuse to speak with Defendant Murray. Plaintiff cites two Georgia cases finding that the police were not discharging their lawful duties when they performed Terry detentions without a particularized and objective basis for suspecting criminal activity. Dkt. No. 13, p. 12 (citing Strickland v. State, 594 S.E.2d 711, 715 (Ga. Ct. App. 2004); Brooks v. State, 425 S.E.2d 911, 914-15 (Ga. Ct. App. 1992)). In Strickland, the court stated that "during the course of such improper detention, a

citizen is free to ignore requests and/or to walk away, and . . . no charge of obstruction will lie . . .". 594 S.E.2d at 715. Plaintiff also cited an Eleventh Circuit Court of Appeals case in which the court found that a police officer sent to a residence regarding a civil dispute could not remain on the property once the homeowner asked him to leave, because, at that point, his continued presence was not part of his official duty or within his lawful authority. Thornton v. City of Macon, 132 F.3d 1395, 1399 (11th Cir 1998) ("Thornton had committed no crime and had not threatened anyone; once he had asked the officers to leave, their continued presence . . . was not pursuant to their official duties and was outside of their authority."). Finally, Plaintiff argues that Defendant Murray was committing a crime by trespassing on Plaintiff's property, and as such, could not have been acting within his discretionary authority.

As for the other Defendant Officers, Green and Carter, Plaintiff maintains that their presence at his home did not relate to any investigation by Defendant Murray of Ms. Brown's allegations, rather they came to back up Defendant Murray after he concluded that Plaintiff committed the crime of obstruction. Plaintiff argues that Defendants Green and Carter had "a duty, in non-exigent circumstances, to make their own independent determination whether the officer they [were] backing up made a

correct conclusion, meaning they [had] a duty to intervene if it [was] readily apparent . . . that the arresting officer's conclusion that a crime has been committed [was] incorrect." Dkt. No. 13, pp. 14-15. According to Plaintiff, it is plainly obvious that, in the absence of a warrant or exigent circumstances, someone cannot be commanded to leave his home and speak with the police, and Defendants Green and Carter should have intervened to stop Defendant Murray from attempting to get a warrant for his arrest. Additionally, these Defendants' own actions were unlawful because they also participated in banging on the windows and doors and asking Plaintiff to come out and talk after Plaintiff commanded Defendant Murray to leave. Id. at 17.

Defendants contend that performing investigations, making arrests, and conducting searches are clearly activities which fall within the discretionary authority of law enforcement officers. Dkt. No. 8-1, p. 4. According to Defendants, the proper inquiry is whether the particular activity at issue is within the duty and authority of law enforcement officers, and all of the activities alleged in this case involve generally recognized activities performed by law enforcement officers (e.g., taking reports of crimes from citizens, performing follow-up investigations, obtaining and executing arrest warrants). Dkt. No. 15-2, p. 7.

Defendants further contend that the Georgia cases cited by Plaintiff are irrelevant because they both involved whether there was sufficient evidence to uphold convictions in criminal appeals rather than discretionary authority or qualified immunity. Id. at 7 (discussing Strickland, 594 S.E.2d at 715; Brooks, 425 S.E.2d at 914-15)). Defendants argue that Thornton has been repeatedly distinguished because of its unique facts: the officers in that case inserted themselves in a purely civil dispute, and no criminal activity had occurred or was reported. Id. at 7-8 (citing Thornton, 132 F.3d at 1399). Defendants maintain that this case is different from Thornton because here there was a citizen call and complaint which at least raised suspicion that a crime was attempted or had occurred. Moreover, the officers in Thornton lacked warrants for the arrests that they made. Id. at 8.

Defendants maintain that Plaintiff cannot ask the Court to ignore the police report because Plaintiff did not allege any facts to contradict that Ms. Brown called the police to complain about Plaintiff trying to enter her home. Additionally, Defendants argue that Plaintiff has not pointed to any authority showing that police are not acting within their discretionary authority when they secure a location while another officer goes to obtain warrants. Dkt. No. 15-2, p. 9. According to Defendants, Plaintiff's test for discretionary authority is

essentially that an officer acts outside of his discretionary authority any time he performs an activity which violates someone's constitutional rights. Defendants contend that this cannot be the test, because no one would ever be able to show entitlement to qualified immunity if it were—the mere allegation of unconstitutional behavior would place an officer outside the scope of his discretionary authority. Id.

Based on the Complaint and its attachments, the Defendant Officers in this case were undisputedly at Plaintiff's residence investigating Ms. Brown's complaint that Plaintiff had tried to enter her home. Defendants attempted to speak with Plaintiff before obtaining warrants for the search of Plaintiff's home and his arrest. Performing investigations, obtaining and executing warrants, and making arrests, are all legitimate job-related functions of police officers. See Pair v. City of Parker Fla. Police Dep't, 383 F. App'x 835, 839 (11th Cir. 2010) (obtaining warrant and making arrest was within scope of officer's discretionary authority); Townsend v. Coffee Cnty., Ga., 854 F. Supp. 2d 1345, 1356 (S.D. Ga. 2011) ("Carrying out an investigatory stop and making an arrest are quintessentially discretionary acts of law-enforcement officials") (citations omitted). Despite Plaintiff's arguments to the contrary, the means utilized by the Defendant Officers were all within their power to utilize. The alleged unconstitutionality of the

16

Defendant Officers' actions does not put those actions outside the scope of their discretionary authority, and Defendants are correct in pointing out that qualified immunity would never apply to protect government officers against allegations of unconstitutional conduct if that were the case. See Harbert Int'l, Inc. v. James, 157 F.3d 1271, 1282 (11th Cir. 1998) ("a court must ask whether the act complained of, if done for a proper purpose, would be within, or reasonably related to, the outer perimeter of an official's discretionary duties") (citations omitted). Thus, Defendants were acting within the scope of their discretionary authority throughout their interactions with Plaintiff on May 22, 2013, and the burden shifts to Plaintiff to show that the Defendant Officers are not entitled to qualified immunity.

Plaintiff, on the one hand, attempts to equate his situation to a first-tier consensual Terry stop that he was at liberty to walk away from, but on the other hand, suggests that this case is different from a second-tier police-citizen encounter because it did not occur in a public place—rather, it happened while he was in his home. Plaintiff asserts that his Fourth Amendment rights were violated by "an intrusion into the sanctity of the home and an unconstitutionally wrongful arrest and detention under legal process." Dkt. No. 13, pp. 9, 17. Because Plaintiff was inside of his home from the commencement

AO 72A
(Rev. 8/82)

of his interactions with the police, the Defendant Officers'
entry onto Plaintiff's property and Plaintiff's subsequent
arrest must have been supported by arguable probable cause in
order for the Defendants' actions to be protected by qualified
immunity.  See Brown v. City of Hunstville, Ala., 608 F.3d 724,
734 (11th Cir. 2010) ("To receive qualified immunity, an officer
need not have actual probable cause, but only 'arguable'
probable cause.") (citations omitted).

"Arguable probable cause exists where 'reasonable officers
in the same circumstances and possessing the same knowledge as
the Defendants could have believed that probable cause existed
to arrest Plaintiff." Grider v. City of Auburn, Ala., 618 F.3d
1240, 1257 (11th Cir. 2010) (quoting Kingsland v. City of Miami,
382 F.3d 1220, 1232 (11th Cir. 2004)). As the probable cause
standard is an objective one, a court need not inquire into the
officer's subjective intent or beliefs. Grider, 618 F.3d at
1257 (citation omitted). The assessment of whether or not an
officer has probable cause or arguable probable cause depends on
the elements of the crime alleged, but "[s]howing arguable
probable cause does not, however, require proving every element
of a crime." Brown, 608 F.3d at 735 (citation omitted). "If
the arresting officer had arguable probable cause to arrest for
any offense, qualified immunity will apply." Id. (citing Skop
v. City of Atlanta, Ga., 485 F.3d 1130, 1138 (11th Cir. 2007)).

AO 72A
(Rev. 8/82)

Under Georgia law, misdemeanor obstruction occurs when "a person [] knowingly and willfully obstructs or hinders any law enforcement officer in the lawful discharge of his official duties[.]" O.C.G.A. § 16-10-24(a). A person commits criminal trespass "when he or she knowingly and without authority . . . enters upon the land or premises of another person . . . for an unlawful purpose[.]" O.C.G.A. § 16-7-21(b). A person may be guilty of criminal attempt in Georgia if "with intent to commit a specific crime, he performs any act which constitutes a substantial step toward the commission of that crime." O.C.G.A. § 16-4-1.

Plaintiff's argument and conclusory allegation that Defendant Murray had no reasonable suspicion that Plaintiff had committed any crime when he approached Plaintiff's house is significantly undercut by the fact that Ms. Brown called the police to inform them that Plaintiff had tried to enter her residence. Plaintiff insists that it is speculation for the Court to find that a crime was committed, and according to Plaintiff, no crime was committed if Plaintiff was "merely opening the door and about to set foot inside when Ms. Brown told him to leave and he did." Dkt. No. 13, p. 8. However, the relevant inquiry is not whether a crime was actually committed but rather whether a reasonable officer in the same circumstances and possessing the same knowledge as Defendant

Murray could have believed that probable cause existed to arrest Plaintiff.

The attachments to the Complaint document that Ms. Brown called the police because someone was trying to enter her home. She gave a description of the person's means of transportation (a red racing bicycle) and where he lived (across from a particular store), and Defendant Murray found bicycle tracks going into the residence at the location described by Ms. Brown. A reasonable officer in Defendant Murray's circumstances would believe that probable cause existed to arrest Plaintiff for criminal trespass or criminal attempt to commit criminal trespass.[3] Even though Defendant Murray did not know Plaintiff's purpose for trying to enter Ms. Brown's home (and thus, whether or not it was unlawful), showing probable cause does not require showing all of the elements of the crime. The Court finds that there was at least arguable probable cause to arrest Plaintiff for the crime of criminal trespass or criminal attempt, and the Defendant Officers' initial warrantless entry onto Plaintiff's property was not a violation of Plaintiff's Fourth Amendment rights.

Because the Defendant Officers had arguable probable cause to arrest Plaintiff for the offense of criminal trespass, qualified immunity applies to protect the officers even from

_____

[3] Trying to enter Ms. Brown's home against her will could be considered a substantial step towards the commission of criminal trespass.

Plaintiff's allegations that the warrants were deficient. See Skop, 485 F.3d at 1138; see also Gonzalez v. Butts Cnty., Ga., 522 F. App'x 742, 746-47 (11th Cir. 2013) (though no reasonable officer could have believed plaintiff was guilty of crime listed on arrest warrant, officers were entitled to qualified immunity because a reasonable officer could have concluded he had probable cause to arrest plaintiff for a different crime).

However, even considering Plaintiff's challenges to the sufficiency of the warrants in this case and the constitutionality of his arrest, "the fact that a neutral magistrate [] issued a warrant is the clearest indication that the officers acted in an objectively reasonable manner[.]" Messerschmidt v. Millender, 132 S. Ct. 1235, 1245 (2012). And immunity should be denied where "it is obvious that no reasonably competent officer would have concluded that a warrant should issue." Id. (quoting Malley v. Briggs, 475 U.S. 335, 341 (1986)).

Here, the Defendant Officers sought and obtained a warrant to arrest Plaintiff for the crime of obstruction of a law enforcement officer. Under Georgia law, a person commits obstruction when he knowingly and willfully obstructs or hinders any law enforcement officer in the lawful discharge of his official duties. O.C.G.A. § 16-10-24(a). In the warrant application, Defendant Murray stated that Plaintiff "disobeyed a

lawful command given" to him by Defendant Murray. In light of

Ms. Brown's call to the police, and Defendant Murray's arguable

probable cause to arrest Plaintiff for criminal trespass,

Defendant Murray's command to Plaintiff to come to the door was—

contrary to Plaintiff's protestations—lawful, and a reasonable

officer possessing the information Defendant Murray had could

have believed there was probable cause to arrest Plaintiff for

obstruction of a law enforcement officer.

The Court of Appeals of Georgia has affirmed an obstruction

conviction in a case with similar facts. See Bailey v. State,

379 S.E.2d 816, 816-17 (Ga. Ct. App. 1989). In Bailey, An off-

duty police officer was leaving work and observed a man driving

recklessly and passing through a stop sign. The officer

followed the man to a residence where she showed the man her

badge and asked him for identification. The man went inside the

residence and refused to come out. The officer swore out a

warrant for obstruction and arrested the man. The Bailey court

stated that "the trial court was authorized to find that

appellant's refusal to identify himself was not merely

discourteous, it actually hindered and obstructed [the officer]

in her investigation of the reckless driving and stop-sign

violation." Id. at 817. Though Plaintiff's refusal in this

case was to speak with Defendant Murray rather than to provide

identification, a reasonable officer could have believed that

Plaintiff's refusal to speak to Defendant Murray actually hindered and obstructed Defendant Murray in his investigation of Ms. Brown's incident report, such that there was probable cause for Plaintiff's arrest. With this being the case, it is far from obvious that no reasonably competent officer would have concluded that a warrant should issue, and qualified immunity protects the Defendant Officers for their arrest of Plaintiff.

In the absence of a constitutional violation, the Court need not determine whether the rights at issue were clearly established. The Court still notes that Plaintiff's argument that the law was clearly established depended on the assertion that "there was no warrant and no reasonable suspicion of criminal activity." Dkt. No. 13, p. 19. The exhibits submitted with Plaintiff's Complaint plainly contradict this conclusory assertion, and in such a case, the exhibits govern. Griffin, 496 F.3d at 1205-06. While the case of Thornton might, as Plaintiff suggests, clearly establish "that an officer is not in the lawful discharge of his official duties when he remains upon property after being asked to leave if his presence is a first tier, consensual encounter which has not elevated to a second tier detention or a third tier arrest", Dkt. No. 13, p. 20 (citing Thornton, 132 F.3d at 1399), the Defendant Officers in this case had arguable probable cause to arrest Plaintiff. Plaintiff has not shown that it is clearly established that the

Defendant Officers could not enter his property and arrest him with probable cause, and later, a warrant. Additionally, the more obvious lesson of Thornton is that police officers "merely attempting forcibly to resolve a civil dispute" do not have probable cause to arrest a person who asks the officers to leave his property. 132 F.3d at 1399. Nothing in Plaintiff's pleadings suggests that the Defendant Officers were attempting to resolve a civil dispute, and exhibits submitted with the Complaint show that Ms. Brown's complaint was criminal rather than civil in nature. Thus, Thornton is distinguishable from the present case.

In the Eleventh Circuit, the existence of probable cause for an arrest eliminates the arrestee's ability to bring a First Amendment claim against the arresting officers. Dahl v. Holley, 312 F.3d 1228, 1236 (11th Cir. 2002) ("Whatever the officers' motivation, however, the existence of probable cause to arrest [plaintiff] defeats her First Amendment claim.") (citing, inter alia, Redd v. City of Enterprise, 140 F.3d 1378, 1383 (11th Cir. 1998) ("Because we hold that the officers had arguable probable cause to arrest [plaintiff] for disorderly conduct, we must hold that the officers are also entitled to qualified immunity from plaintiffs' First Amendment claims.")); see also Reichle v. Howards, 132 S. Ct. 2088, 2093-94 (2012) ("This Court has never recognized a First Amendment right to be free from a retaliatory

AO 72A
(Rev. 8/82)

arrest that is supported by probable cause[.]"). Thus, Plaintiff has not shown that the Defendant Officers violated his clearly established First Amendment rights.

In light of the foregoing analysis, the Defendant Officers are entitled to qualified immunity, and all of Plaintiff's federal claims against them are dismissed.

### b. Municipal Liability

Plaintiff argues that the City may be held liable because Defendant Green, a final policymaker, made a deliberate choice to support Defendant Murray and to participate in the alleged constitutional violations. "Because Plaintiff has failed to establish that his constitutional rights were violated, he has necessarily failed to establish the City's liability." Miller v. Harget, 458 F.3d 1251, 1261 (11th Cir. 2006) (citing City of Los Angeles v. Heller, 475 U.S. 796, 799 (1986)). Accordingly, Plaintiff's claims against the City are subject to dismissal at this time.

### c. State Law Claims

Having dismissed all federal claims over which this Court has original jurisdiction, the Court declines to exercise its supplemental jurisdiction over Plaintiff's remaining state law claims. 28 U.S.C. § 1367(c)(3); Raney v. Allstate Ins. Co., 370 F.3d 1086, 1089 (11th Cir. 2004) (encouraging district courts to dismiss remaining state law claims where federal claims have

AO 72A
(Rev. 8/82)

been dismissed prior to trial); <u>Townsend</u>, 854 F. Supp. 2d at 1358. Plaintiff's state law claims were not considered on the merits and are thus dismissed without prejudice.

**IV. CONCLUSION**

For the foregoing reasons, Defendants' Motion to Dismiss is **GRANTED**. Plaintiff's federal claims are hereby **DISMISSED**, and his state law claims are **DISMISSED** without prejudice. The Clerk of Court is instructed to enter the appropriate judgment.

**SO ORDERED**, this 31ST day of March, 2015.

LISA GODBEY WOOD, CHIEF JUDGE
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF GEORGIA

AO 72A
(Rev. 8/82)